## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MOUSSA KOUYATE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| L. PERRIGO COMPANY and PADAGIS US LLC, | |
| Defendants. | |

### CLASS ACTION COMPLAINT

Plaintiff Moussa Kouyate ("Plaintiff"), on behalf of himself and all others similarly situated, for his complaint against Defendants L. Perrigo Company ("Perrigo") and Padagis US LLC ("Padagis") (collectively, "Defendants"), upon personal knowledge as to himself and his own actions, and upon information and belief including the investigation of counsel as to all other matters, alleges follows.

### NATURE OF THE ACTION

1.     This class action lawsuit arises from the Defendants' manufacture, distribution, and sale of Perrigo® branded Acne Treatment Gel products that contain benzoyl peroxide ("BPO") as their active ingredient (the "Products").  The Products are topical gels that are used to fight acne. Either at the point of manufacture or when exposed to degrees of heat that anti-acne products routinely encounter during transportation, storage and use, the Products degrade, causing them to contain, during customer use, dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.     When a major independent lab tested 66 BPO products over 18 days, it found the vast majority of them contained ingredients that degrade to benzene over time when exposed to

heat. Defendants' Product, however, was one of only ten that the lab found to have excessively high levels of more than 10 parts per million (ppm) of benzene on Day 0 of testing.  That means that Defendants' Products had unacceptably high benzene levels **when they were purchased**, without being exposed to any heightened testing conditions.[1]

3.     The danger of such benzene levels is significant.   The Food and Drug Administration ("FDA") has instructed that any level of benzene, unless entirely unavoidable, which, here, it is not, should not be used in the manufacture of drug products.[2]  Moreover, it has issued a warning that companies discovering more than 2 ppm of benzene in any product should contact the FDA about a voluntary recall.[3]  Here, testing showed the Products to contain more than 14 ppm of benzene on Day 0 of testing, and to contain at least 8 ppm throughout the lengthy testing process.[4]

4.     The Products are not meant to contain benzene, and the benzene here does not serve any necessary or beneficial purpose.  Thus, the presence of benzene in the Products causes them to be adulterated and misbranded, and, as such, illegal to introduce into interstate commerce and to sell.  The illegality exists under federal and state law.  Because of these characteristics, as well as the danger benzene poses, the Products are worthless.

5.     Defendants knew or should have known of the degradation of their Products leading to benzene formation, but failed to disclose it, misrepresented the truth about it, and/or

---

[1] *See* https://www.valisure.com/valisure-newsroom/the-importance-of-stability-testing; Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products ("Valisure Petition"), at 17, available at https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf (last visited Aug. 21, 2025).
[2] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last visited Aug. 21, 2025)
[3] *Id.*
[4] Valisure Petition at 17.

willfully omitted it from their labeling, packaging and marketing.

6.      Notably, Defendants list both active and inactive ingredients on the Products' labels.  Benzene, however, is not among those listed, nor does the label indicate in any way that the Products can degrade to form and contain benzene.

7.      In addition, the Products' packaging includes a warnings section.  This contains warnings like "[f]or external use only" and "do not use if you … have very sensitive skin."  That creates the impression that the listed risks are the only risks that need be warned of concerning the product.  It is made misleading by the omission of the systemic likelihood that the Product would contain a carcinogen during customer use.

8.      Moreover, the Products are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state law analogues. These cGMP regulations require over the counter ("OTC") medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B). The Defendants here failed to ensure that the Products were made and transported in accordance with cGMPs, which is another basis on which they are adulterated and misbranded and should not be sold.

9.      Due to Defendants' failure to use cGMPs, they failed to detect the benzene in their products or prevent those products from containing or having the risk of containing benzene (or failed to act on their findings if they did detect this).  Plaintiff and other consumers were harmed thereby.

10.      Defendants' failure to prevent the formation of benzene in the Products harmed Plaintiff and other members of the proposed Class and Subclasses (defined below).  Plaintiff and other members of the proposed Class and Subclasses purchased the Products while having no reason to know that they contained or were likely to degrade to contain this carcinogen.  They

were harmed because they would not have purchased the Products had they known this information or would have paid significantly less for them.  Plaintiff and members of the Proposed Class and Subclasses relied on Defendants' representations and omissions when they purchased the Products.

11.    Through this action, Plaintiff seeks remedy for the consumer harm that Defendants' actions caused to him and all others similarly situated.

## PARTIES

12.    Plaintiff Moussa Kouyate is a resident and citizen of New York, New York. Within the last two years, Mr. Kouyate purchased one or more of Defendants' Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% Products in New York.  Mr. Kouyate purchased the Products in person for personal use.  The Products did not include any statement that that they contained or risked containing benzene.   When purchasing the Products, Mr. Kouyate reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the anti-acne products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell.  Mr. Kouyate relied on these representations and warranties in deciding to purchase the anti-acne products manufactured and sold by Defendants.  These representations and warranties were part of the basis of the bargain he made in purchasing, in that he would not have purchased the Products from Defendants if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use, or that they were adulterated, misbranded, or illegal to sell.

13.    The Products Mr. Kouyate bought were worthless because they contained or would degrade to contain benzene under normal manufacturing, transport and storage conditions, therefore rendering the products improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.  Thus, Mr. Kouyate was injured in two ways

by Defendants.  First, Mr. Kouyate purchased adulterated and misbranded anti-acne products that were illegally sold to him, and therefore worthless.  Second, Mr. Kouyate was deceived by Defendants' representations and omissions regarding the presence of benzene in the anti-acne products.

14.     Mr. Kouyate would be willing to purchase the Products again, if he could be confident that the products no longer contain or pose a significant risk of degrading to contain benzene.

15.     Defendant L. Perrigo Company is incorporated in Michigan and has its principal place of business at 515 Eastern Avenue, Allegan, Michigan 49010. Defendants Perrigo markets, sells, and distributes Perrigo branded BPO Products throughout the United States and its territories. Defendants Perrigo authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its Perrigo branded BPO Products.  Defendant Perrigo's main manufacturing facility is also in Allegan, Michigan.

16.     Defendant Padagis US LLC is a incorporated in Delaware and has its headquarters at 1251 Lincoln Road, Allegan, Michigan 49010.  It was formerly Perrigo's generic prescription pharmaceuticals business, acquired by Altaris in 2021.  On information and belief, while part of Perrigo, it manufactured, distributed, and/or sold the Products.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

18.     This Court has personal jurisdiction over Defendants because Defendants are

headquartered in this District.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District, Defendants has marketed, advertised, and sold the Products in this District, and Defendants has caused harm to Plaintiff and other Class members in this District.

## FACTS

## I.    DEFENDANTS BENZOYL PEROXIDE PRODUCTS DEGRADE TO CONTAIN CARCINOGENIC BENZENE

### A.    Defendants' Role with Respect to Dangerous Products

20.    Defendant Perrigo manufactures, markets, distributes and sells various skin care products, including Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% and other Perrigo branded acne treatments containing BPO.  On information and belief, prior to 2021, when it split off from Perrigo, Defendant Padagis also manufactured, distributed, marketed and/or sold Perrigo® Benzoyl Peroxide Acne Treatment Gel 5%.

21.    As the Products' name suggests, it contains benzoyl peroxide ("BPO").  BPO is an ingredient in many, but not all, over-the-counter acne topical treatments.  It works as an antiseptic to decrease the bacteria on the skin that can cause acne outbreaks.

22.    As detailed further below, independent scientific testing by a dedicated and reliable testing company, Valisure, LLC ("Valisure"), has established that the Products experience degradation that forms dangerous levels of the carcinogen, benzene.[5]  The degradation and benzene formation happens at temperatures that the Products are exposed to

---

[5] *See* Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products ("Valisure Petition"), available at https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf (last visited Aug. 21, 2025).

during distribution and handling.[6]

23.    On information and belief, Defendants always manufactured, stored and transported the Products in the same manner and all lots are thus prone to the same forms of degradation through temperature and time.

**B.    The Carcinogenic Dangers of Benzene**

24.    Benzene is a colorless or pale-yellow chemical that is a component of crude oil, gasoline, and cigarette smoke.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Benzene is associated with blood cancers such as leukemia.[7]  It has also been associated with anemia and damage to the immune system.  The Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."

25.    A study from 1939 on benzene stated that "possibly, exposure over a long period of time to any concentration of benzene greater than zero is not safe."[8]  A 2010 review of benzene research confirmed this comment, specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[9]

26.    The World Health Organization has stated that, "[h]uman exposure to benzene has

---

[6] *Id.* at 20-21, stating that a temperature even significantly higher than the one at which testing was performed is one that "the product may be exposed to during distribution and handling by consumers."

[7] National Cancer Institute, Cancer-Causing Substances, Benzene, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (visited August 25, 2025).

[8] F.T. Hunter, *Chronic Exposure to Benzene (Benzol). II. The Clinical Effects*, 21 JOURNAL OF INDUSTRIAL HYGIENE AND TOXICOLOGY 331 (1939), https://pubmed.ncbi.nlm.nih.gov/20070208/ (visited August 25, 2025)

[9] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646. (visited 8/21/25)

been associated with a range of acute and long-term adverse health effects and diseases, including cancer and hematological effects."[10]

27.    According to the American Cancer Society, the International Agency for Research on Cancer ("IARC"):

> classifies benzene as "carcinogenic to humans," based on sufficient evidence that [benzene] causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[11]

28.    The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells. This can lead to anemia. It can also hurt the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[12]   The CDC also cautions that "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[13]

29.    In December 2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and warned that any drug containing more than 2 parts per million (ppm) benzene was adulterated and should be the subject of a recall. That statement was updated on December 27, 2023.   The current version, available on the FDA's website at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs, states that, as set forth in guidance from the International Conference on Harmonization (ICH) … " Class 1 solvents such as benzene should not be

---

[10] https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health/health-impacts/chemicals/benzene.

[11] American Cancer Society. Benzene and Cancer Risk (January 5, 2016), https://www.cancer.org/cancer/cancer-causes/benzene.html.

[12] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[13] https://pubchem.ncbi.nlm.nih.gov/compound/Benzene#section=Skin-Eye-and-Respiratory-Irritations

employed in the manufacture of drug substances, excipients, or drug products because of their unacceptable toxicity," and that "if benzene use is ***unavoidable*** to produce a drug product with a significant therapeutic advance, then its levels should be restricted to ***2 parts per million*** (ppm), unless otherwise justified."  (Emphasis supplied).  The FDA alert also states that the FDA is aware of ingredients that "may yield benzene under certain conditions" and thus, the "FDA reminds manufacturers ***that changes in raw materials throughout the lifecycle of the drug***, including changes in raw material suppliers, ***warrant additional scrutiny for the potential risk of benzene contamination***."  (Emphasis supplied.)  It instructs manufacturers to test their drugs accordingly, and states that, "[***i]f any drug product batches with benzene above [2 ppm] are already in distribution, the manufacturer should contact the . . . FDA to discuss the voluntary initiation of a recall***."  (Emphasis supplied.)

30.    According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, ***skin absorption***, ingestion, ***skin and/or eye contact.***"[14]  (Emphasis supplied.)

31.    The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, ***skin absorption***, ingestion, ***skin and/or eye contact***" as exposure routes.

32.    Skin absorption is particularly concerning as there have been multiple FDA studies showing that benzene in sunscreen products are found in the blood at high levels after application to exposed skin.[15]

---

[14] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html (emphasis added).

33.     Benzene exposure from topical acne treatments is, thus, especially troubling because the treatments are applied directly onto the skin, often multiple times a day for an extended period. Thus, even a relatively low concentration can result in very high total benzene exposure.

*BPO Degrades into Benzene*

34.     BPO, including the BPO in the Products, degrades in common conditions to form benzene through the following mechanism:[16]



35.     In summary, the benzoyl peroxide thermally decomposes to form two molecules of benzoic acid radicals.  Those, in turn, can further decompose to form benzene radicals with liberation of carbon dioxide.  The benzene radicals that were thus produced can then produce benzene.[17]  This process is commonly triggered by exposure to elevated temperatures such as those that can be encountered in a hot shipping container, truck, or car.

36.     Valisure has stated that the conditions for degradation of the benzoyl in acne

---

[15] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen (last visited Aug. 21, 2025).
[16] Valisure Petition at 1.
[17] Valisure Petition at 2.

products including the Products include the following[18]:



37.    The creation of benzene in the Products is thus an ordinary and foreseeable result of the manner in which the Products are distributed and stored.  The results and risks of this defect are thus experienced by all consumers of the Products.

38.    A consumer cannot be expected to know what conditions their product was exposed to before purchase.  A consumer also cannot be expected to test each individual tube of a product to determine whether that tube is one that has formed benzene.  Such testing of every tube, prior to use, would be highly cost prohibitive.  Instead, a reasonable consumer would be expected to not choose to purchase or use a product where there is a significant risk that it has been exposed to temperatures that would cause it to contain benzene.  Defendants' actions here denied Plaintiff and members of the Class the ability to make that choice.

---

[18] https://www.valisure.com/valisure-newsroom/new-valisure-scientific-paper-on-benzene-in-benzoyl-peroxide-products (last visited Aug. 21, 2025)

39.    The degradation of benzoyl peroxide into benzene has been studied and addressed in scientific literature.  On information and belief, Defendants, as large-scale manufacturers of benzoyl peroxide products knew of this issue and the harms that it could cause.

40.    Moreover, the problem was avoidable.  For example, research indicates that the addition of certain antioxidants can reduce the formation of benzene in benzoyl peroxide products by 98%.[19]  On information and belief, Defendants could have avoided the formation of benzene in the Products by changing their ingredients, manufacturing, or packaging.

41.    Despite all of the foregoing, Defendants failed to take obvious and requisite steps to disclose any of this necessary information to consumers about the formation and presence of benzene in their Products and/or to mitigate the risk that benzene would form in those Products.

**C.    Valisure Finds Benzene in Defendants' Products**

**1.    Valisure's Experience and Credibility**

42.    Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products, containing said harmful chemicals, from reaching consumers.  Valisure, the laboratory that performed the testing here, is one such company.  Its core mission is "to help ensure the safety, quality and consistency of medications and supplements in the market … [and] [i]n response to rising concerns about drug shortages, generics, and overseas manufacturing, Valisure developed and validated methods to test medications and consumer products distributed in the United States."[20]

43.    Since launch, Valisure has filed eight FDA Citizen Petitions after finding carcinogens in various drugs, —all resulting in recalls.  Over the years, Valisure has tested for

---

[19] Valisure Petition at 26.

[20] *Id.* at 5.

and found specific improper chemical components in numerous types of products.  These have included, for example, N-nitrosodimethylamine ("NDMA") in ranitidine (Zantac), NDMA in metformin, benzene in hand sanitizers, benzene in sun care products, and benzene in antiperspirants.  Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by members of the industry and, very often, they have led to recalls by manufacturers of subject products.

44.     For example, in response to Valisure's 2019 Citizen Petition on the inherent instability of ranitidine (Zantac)10 and its formation of the probable human carcinogen N-nitrosodimethylamine ("NDMA"), FDA requested that manufacturers withdraw all ranitidine drug products from the market due to FDA's finding that "NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers."[21]

45.     The FDA contacted *all* manufacturers of ranitidine (Zantac) 10, and asked them to recall their products.  The FDA stated, in a press release about the recall:

> We didn't observe unacceptable levels of NDMA in many of the samples that we tested. However, since we don't know how or for how long the product might have been stored, we decided that it should not be available to consumers and patients unless its quality can be assured," said Janet Woodcock, M.D., director of the FDA's Center for Drug Evaluation and Research.[22]

46.     In 2021, Valisure's finding of benzene in consumer hand sanitizer led to product recalls.  Likewise, for example, in 2021 Valisure's finding of benzene in sunscreen led to the voluntary recall of numerous sunscreen products.  Its finding of benzene in antifungals led to further recalls, as did its finding of benzene in body sprays.  Yet again, in 2022, Valisure's

---

[21] https://www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market (visited August 25, 2025).
[22] *Id.*

finding of benzene in dry shampoos led to the voluntary recall of numerous dry shampoos.[23] The Products at issue here are similarly dangerous.

> **2.    Valisure's Discovery of Benzene in the BPO Products at Each Phase of Testing**

47.    In 2024, Valisure turned its attention to benzoyl peroxide acne treatments.  It put the products through multiple phases of testing under varying conditions.  In short, it found the carcinogen benzene at all stages of review.  Valisure and scientists at Yale Medical School have published findings about the degradation of BPO in acne products into benzene in respected scientific journals.  In March, 2024, Valisure filed a citizen's petition seeking recall of products including the Products.[24]

> *a)*    **Testing Without Incubation at Heightened Temperatures Finds Dangerous Levels of Benzene**

48.    An early round of Valisure's testing found benzene in 94 out of 99 BPO products that it purchased.  *These were tested without incubation at heightened temperatures*, demonstrating that the degrading of BPO into benzene happens under normal manufacturing, shipping, and or/storage of these products.

49.    More specifically, Valisure performed initial testing for 175 products, of which 99 contained BPO as an active ingredient.[25]

50.    The benzene levels in the BPO products that were tested without incubation were often at levels -well above 2 ppm.  *Id.*

51.    On information and belief, the Products were among the vast majority of products in which benzene was detected at this stage.  This information and belief is based in part on

---

[23] *See* https://www.valisure.com/valisure-newsroom/timeline-of-consumer-product-recalls-due-to-benzene.
[24] *See* Valisure Petition.
[25] *See* Valisure press release dated March 6, 2024, at 3, available at https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide

Valisure's determination, at the next stage of its study, that more than 14 ppm of benzene were detected on Day 0 of that of the next round of study, before the product was exposed to any heightened temperatures.

52.     The FDA requires that "if benzene use is **unavoidable** to produce a drug product with a significant therapeutic advance, then its levels should be restricted to 2 parts per million (ppm), unless otherwise justified."[26] (emphasis supplied)  However, first, Defendants do not meet any of these requirements for even allowing 2 ppm.  First, Defendants' Products contain levels of benzene above this amount.  Second, as Valisure explained, "considering the long history and widespread use of BPO products, it does not appear that they currently constitute a significant therapeutic advance."[27]   Third, the presence of benzene was avoidable: benzene production through degradation can be limited by an anti-oxidant.  Thus, Defendants' benzene contaminated products should not have been on the market and should not continue to be so.

53.     That was significant because, again, the FDA, instructs manufacturers to test their drugs and states that, "[*i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact the . . . FDA to discuss the voluntary initiation of a recall*."  (Emphasis supplied.)

54.     Despite this presence of benzene at over 2 ppm in Defendants' product, Defendants did not contact the FDA about a voluntary recall.

**b)     The Second Phase of Testing Found the Perrigo Products Highly Dangerous at All Stages**

55.     Valisure's initial testing results led it to conduct further testing at elevated temperatures of a diverse range of 66 BPO products available in the market.  These included the

---

[26] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs
[27] Valisure Petition at 1.

Products.

56.    The Products were tested over an 18 day period, at days 0, 4, 10, 14 and 18.[28]  On Day 0, the tests looked at "levels of benzene detected at room temperature, before the products were incubated" at higher temperatures.[29]

57.    When Defendants' Perrigo branded gel containing 5% benzoyl peroxide was tested at Day 0, at room temperature, ***in the state that Valisure purchased it***, the Product contained 14 ppm of benzene.

58.    After the Day 0 tests were performed, the products were incubated at an elevated temperature level of 50°C.  That, as Valisure explained, was a temperature the products were likely to encounter during distribution and handling by consumers.  Moreover, 50°C temperature has deemed appropriate for accelerated stability studies in the pharmaceutical industry.[30]

59.    The purpose of stability studies is to ensure a product is safe to use for the entire lifecycle of a product, from manufacturing through distribution to its expiration date, a period that often extends three years. Products must be stable throughout the relevant period and through all the conditions they in encounter along the way.  This type of testing was necessary for the products at issue because the benzene in BPO products occurs through degradation of the

---

[28] Valisure Petition at 15.
[29] https://www.valisure.com/valisure-newsroom/the-importance-of-stability-testing
[30] Valisure Petition at 18-19, citing Ghimire, Prakash & Shrestha, Abinash & Pandey, Sandhya. (2020). Guidelines on Stability Studies of Pharmaceutical Products and Shelf Life Estimation. *International Journal of Advances in Pharmacy and Biotechnology*. 06. 15-23. 10.38111/ijapb.20200601004.  Indeed, the study explains that even higher temperatures of 70 C are temperatures to which products may be exposed during shipping and handling, and are within the range of a hot car where many consumers may store or transport an acne treatment product, and is also the 3-year accelerated stability equivalent of 43 days, which, "means that to achieve the expected minimum shelf life of 3 years for a standard pharmaceutical product, the product should exhibit stability for at least 43 days of 70°C incubation." Valisure also added that its results at only 14 and 18 days of 70°C incubation already show unacceptably high levels of benzene detected within the product and would expect substantially more benzene to have been produced by Day 43.

BPO over time.  In accelerated stability studies, elevated temperatures are used to simulate shelf life in compressed periods.  As Valisure has explained:

> It is common to condense the total stability of a product intended for multiple years of use by performing 'accelerated' stability studies that elevate the temperature for a few months. For example, according to publicly available calculators, 3 years of room temperature stability is equal to about 169 days at 50°C (122°F).[31]

60.     In the testing it performed here, for many products, Valisure broadly observed dramatically high levels of benzene in only 18 days at 50°C.[32]

61.     After conducting this testing, Valisure reported that it "detected high levels of benzene, a known human carcinogen, in many specific batches of BPO products."[33]  David Light, Valisure's Co-Founder and President explained: "This discovery of benzoyl peroxide's fundamental instability and formation of benzene is substantially different than Valisure's previous findings of benzene in sunscreens, hand sanitizers and other consumer products. The benzene we found in sunscreens and other consumer products were impurities that came from contaminated ingredients; however, the benzene in benzoyl peroxide products is coming from the benzoyl peroxide itself, sometimes at hundreds of times the conditional FDA limit. This means the problem broadly affects benzoyl peroxide products, both prescription and over-the-counter, **and necessitates urgent action**."[34]  (emphasis supplied).

62.     Plaintiff acknowledges that on March 11, 2025, the FDA announced that it has tested 95 benzoyl peroxide products and only found that six of them had elevated levels of benzene, which lead to voluntary recalls of those six products, and that the six recalled products

---

[31] https://www.valisure.com/valisure-newsroom/the-importance-of-stability-testing
[32] *Id.*
[33] Valisure Petition, at 1.
[34] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (visited August 25, 2025).

did not include Perrigo's products.  The FDA has not yet publicly listed the 95 products that it

tested, but merely stated that it tested all benzoyl peroxide products identified by third-party

laboratories as having elevated benzene levels *that FDA was able to purchase at the time of*

*testing*, *as well as additional* marketed products.  That means that the FDA actually tested less

than all of the products that Valisure tested, and it is not clear whether the Perrigo branded

products were among those the FDA tested.  Moreover, as Christopher Bunnick, M.D., Ph.D.,

one of the researchers associated with Valisure's work, has explained:

> One reason that the FDA may have identified less benzene contamination
> than did the researchers … may be because there was a significant amount
> of time between the researchers' initial announcement of their findings
> and the FDA's own testing. "The products that the FDA tested may not
> necessarily have been the same products that we were testing," Bunick
> says. "Companies had time to go back and assess their manufacturing and
> quality control processes, and fix potential problems."[35]

63.    Moreover, in addition to the six products that were recalled as described above,

the manufacturer of an additional BPO anti-acne product, Zapzyt Acne Treatment Gel, recalled

its product due to benzene contamination after conducting its own testing, which, apparently, the

FDA did not find, suggesting that the FDA's testing was not comprehensive.  In short, Plaintiff's

allegations herein are based on the testing underlying Valisure's March 2024 Citizen's position,

and not any testing of BPO products performed by the FDA.

64.    Valisure found in that Defendants' Perrigo-branded Product contained more than

14 parts per million ("ppm") of benzene on Day 0, out of the box.  The amounts of benzene that

Valisure found on Days 4, 10, 14, and 18 are shown in the graph below.[36]  As is clearly visible,

that amount was never less than 8 ppm at any time during the testing:

---

[35] Backman, I., "Why the FDA Recalled Six Popular Acne Products", Yale School of Medicine,
May, 27, 2025, available at https://medicine.yale.edu/news-article/why-the-fda-recalled-six-
popular-acne-products/ (last visited Aug. 21, 2025).
[36] *Id.* at 17.



Figure 4E

65.     Again, the risk to unknowing consumers like Plaintiff is significant. "Epidemiological studies … have shown that even trace levels can cause a substantially increased risk of leukemia."[37]   In the most recent look at the issue, a Letter to the Editor of the Journal of Investigative Dermatology, dated March 7, 2025, the authors reviewed the FDA Adverse Event Reporting System and found "strong signals suggesting an increased risk of malignancy" and skin cancer for those who used BPO products.[38]   There was no call for Plaintiff and others to be unwittingly exposed to such risk.

## II.    DEFENDANTS' FAILURE TO PREVENT OR DISCLOSE THE PRESENCE OF BENZENE RENDERS THE PRODUCTS MISBRANDED, ADULTERATED, ILLEGAL TO SELL, AND DEFECTIVE

### A.    Defendants Did Not Disclose the Benzene

66.     Defendants did not disclose the actual or potential presence of benzene in their Products on the Products' labeling, advertising, marketing, or sale of the Products.  Below is an example of such packaging.

---

[37] Backman, I., "Why the FDA Recalled Six Popular Acne Products", Yale School of Medicine, May, 27, 2025, available at https://medicine.yale.edu/news-article/why-the-fda-recalled-six-popular-acne-products/ (last visited Aug. 21, 2025).
[38] https://www.jidonline.org/article/S0022-202X(25)00300-8/fulltext (last visited Aug. 21, 2025).



67.    Below are enlarged examples of the Drug Facts panels of the packaging.



68.    As shown above, the only active ingredient listed is 5% benzoyl peroxide.  The inactive ingredients listed are carbomer homopolymer type C, dimethicone, disodium lauryl sulfosuccinate, edetate disodium, glycerin, hydrated silica, methylparaben, poloxamer 182, purified water, and sodium hydroxide.  These ingredients do not put consumers on notice that benzene is in the Product and/or that the Product will degrade to contain benzene under normal conditions.

69.    Likewise, the Product's label includes a warnings section listing risks.  That creates the false impression that the listed risks are the only risks that need be warned of concerning the product.  It omits the material risk that the product will degrade to contain the carcinogen, benzene, by the time the consumer uses it.  This is a partial affirmative statement made misleading by the omission.

70.    Moreover, because the Product is sold over the counter (in addition to being available by prescription) people may use widely varying amounts at their own discretion.  Some

may use it briefly for spot treatment, while others may use it over large portions of their face and body for extended periods of time.  The Packages state that the Product can be applied up to three times daily.  The Products' packages do not warn against cumulative risk from repeated use.

71.    The misrepresentations and omissions at issue concern safety.  As such, they are clearly material to a reasonable consumer.

72.    Had the products disclosed the truth, Plaintiff and members of the Class would not have bought them (even if Defendants had not voluntarily recalled them as set forth in the FDA alert), or would have paid significantly less for them.

**D.    Defendants' Failure to Comply with Current Good Manufacturing Practices and the Undisclosed Presence of Benzene Causes the Products to Be Adulterated, Misbranded, and Illegal to Sell**

73.    Acne treatments like the Products are considered over-the-counter drugs that are regulated by the U.S. Food and Drug Administration under the federal Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 et seq., as well as analogous state statutes and regulations.

74.    The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of all OTC acne treatments, including safety data on their ingredients.  The sale of the products in violation of these regulations renders them mislabeled, adulterated, and thus illegal.

75.    First, as noted above, the FDA has issued a statement informing manufacturers of the risk of benzene contamination, including formation in certain conditions, and "remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate specifications (21 CFR 211.84, 21 CFR

211.160).[39] This includes testing of raw materials and finished product batches (21 CFR 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity."[40]  That statement also reminds manufacturers that if they discover products with more than 2 ppm of benzene that are already in distribution, they should reach out to the FDA to discuss initiating a recall.[41]

76.    That FDA alert was issued in December 2022, updated in December 2023, and still remains in effect. Within the past three years, the FDA has announced more than a dozen recalls of drug products and cosmetics with even low levels of benzene.  Defendant has not chosen to recall its Products.

77.    There are many acne products on the market that do not pose a risk of benzene formation.  As noted above, the overwhelming majority of the non-benzoyl peroxide acne treatments that Valisure tested do not contain measurable amounts of benzene, and an obligation to disclose them if they did.  In addition, the addition of certain antioxidants has been shown to reduce benzene formation by 98%.  As such, Defendants' sale of a product likely to contain benzene when transported or stored under normal conditions was not unavoidable.

78.    A drug is considered adulterated under the ***FDCA if its strength differs from, or its quality or purity falls below***, the standard set forth in an official compendium, or if it is not in a compendium, if its strength differs from, ***or its quality or purity falls below that which it is represented to possess***.  21 U.S.C. § 351(b) and (c).  Here, Defendants' Products are less pure than represented, because Defendants do not disclose that they are likely to include benzene at the point when the consumer uses them.

---

[39] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last visited Aug. 21, 2025).
[40] *Id.*
[41] *Id.*

79.     Under the FDCA, a drug is also considered adulterated:

(a)(1) [i]f it consists in whole or in part of any filthy, putrid, or *decomposed* substance;

(a)(2)(A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, *or whereby it may have been rendered injurious to health*; or

(a)(2) (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered *in conformity with current good manufacturing* practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess;

(emphasis supplied.)  The Products here are adulterated under each of these tests.

80.     A drug is misbranded under the FDCA, Section 352, if:

(a)(1) . . . its labeling is false or misleading in any particular. . . .

(f) . . . [if its label does not bear:] (1) adequate directions for use; and (2) *such adequate warnings* against use in those pathological conditions or by children where its use may be dangerous to health, or *against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users* . . .

(i)(1) If it is a drug and its container is so made, formed, or filled as to be misleading; . . .

(j) If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

81.     Defendants' Products are misbranded under each of these standards.

82.     Any drug product that is adulterated or misbranded is illegal to sell.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

83.     The New York Food Drug and Cosmetics law ("NY FDCA"), at 71.05(e) has expressly adopted these federal labeling requirements as its own. The definition of "adulterated"

states that "A drug shall be deemed to be adulterated if the Department has determined the drug to be adulterated or as set forth in the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 351)." At 71.05(f), it states, "[a] drug shall be deemed misbranded as set forth in the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 352)." Indeed, demonstrating New York's strong position against the manufacture of adulterated drugs, N.Y. Educ. Law § 6811 (McKinney) makes it a misdemeanor for "[a]ny person to manufacture, sell, deliver for sale, hold for sale or offer for sale of any drug, device or cosmetic that is adulterated or misbranded."

**1.    The Impact of the Products' Failure to Comply with Current Good Manufacturing Practices**

84.    As OTC drug products regulated by the FDA, the Products are subject to federal current Good Manufacturing Practices ("cGMP") regulations.[42] Indeed, the CFR code references in the FDA's notification about benzene quoted supra at ¶ 75 are citations to regulatorily established cGMPs.

---

[42] In 2010, the FDA issued a "final rule to include benzoyl peroxide as a generally recognized as safe and effective (GRASE) active ingredient in over-the-counter (OTC) topical drug products." 75 FR 9776, OTC Monograph M006 (Part 333, subpart D, Topical Acne Drug Products for OTC Human Use) (the "Acne Drug Monograph"). The Acne Drug Monograph provides that a product containing benzoyl peroxide product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart and each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Thus, the Acne Drug Monograph: a) sets forth what language a BPO product label must include for it not to be misbranded (see 21 C.F.R. § 333.350 (listing required warnings)), and b) also mandates that manufacturers must comply with the general conditions in Section 330.1, which requires that "[t]he product [be] labeled in compliance with chapter V of the [FDCA]" and that "[a]n OTC drug product that is not in compliance with chapter V … is subject to regulatory action." 21 C.F.R. § 330.1(c)(1). Chapter V of the FDCA proscribes the sale of misbranded and adulterated drugs. 21 U.S.C. §§ 351, 352. Because the Perrigo anti-acne Products degrade to contain benzene during routine manufacture, shipping, storage or use, although benzene warning may not be expressly required by the Acne Monograph, it is required by 21 U.S.C. Section 352, because failure to do so would render the packaging false and misleading and therefore misbranded.

85.    The cGMPs require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

86.    Any drug product not manufactured in accordance with cGMPs is deemed 'adulterated' or 'misbranded' under federal law and is not permitted for sale or distribution within the United States. *See* 21 U.S.C. §§ 331(a), 330.1(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

87.    The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a). In other words, manufacturers, like Defendants, at all phases of the design, manufacture, and distribution chain are bound by these requirements.

88.    The cGMPs set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). Defendants did not follow many of the required practices.  In addition, 21 C.F.R. 210.1(b) provides, "(b) The failure to comply with any regulation set forth in this part and in parts 211, 225, and 226 of this chapter in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under section 501(a)(2)(B) of the act and such

drug, as well as the person who is responsible for the failure to comply, shall be subject to regulatory action.

89.    The  FDA's manufacturing practices regulations require, for example, that a drug product manufacturer have, inter alia: "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess" 21 C.F.R. § 211.100(a); "[l]aboratory controls [that] … include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity," 21 C.F.R. § 211.160(b);  adequate acceptance criteria for the sampling and testing of drug products "to assure that batches of drug products meet each appropriate specification and appropriate statistical quality control criteria as a condition for their approval and release," as required by 21 C.F.R. § 211.165(d); rejection of products that "fail[ed] to meet established standards or specifications and any other relevant quality control criteria," (21 C.F.R. § 211.165(f)); rejection of sample lots of components that did not meet the appropriate written specifications of identity, quality and purity and related tests under 21 C.F.R. § 211.84(d), as required by 21 C.F.R. § 211.84(e); testing of "[i]n-process materials … for identity, strength, quality, and purity as appropriate, and approv[al] or reject[ion] by the quality control unit, during the production process, e.g., at commencement or completion of significant phases *or after storage for long periods*," 21 C.F.R. § 211.110(c) (emphasis supplied); establishment and/or following of "test procedures, or other laboratory control mechanisms" to "assure that components, … in-process materials, *labeling*, and drug products conform to

appropriate standards of identity, quality, and purity," as required by 21 C.F.R. § 211.160(a), (b) (emphasis supplied).

90.     The cGMPs also require that, "[l]aboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6). Manufacturers are required to perform testing at release of the product to determine the satisfactory conformance to final specifications for the drug product (21 C.F.R. § 211.165); "to assure that batches of drug products meet each appropriate specification and appropriate statistical quality control criteria as a condition for their approval and release," (21 C.F.R. § 211.165(d)); and to ensure the stability characteristics of drug products and establishment of an appropriate expiration date (21 C.F.R. §§ 211.166, 211.137).

91.     Defendants cannot have followed all of the foregoing cGMPs, because if they had, they would have had to acknowledge the presence of benzene in their products and correct their labels to disclose it.

92.     In addition, cGMPs require manufacturers: to have written warehousing procedures requiring "[s]torage of drug products under *appropriate conditions of temperature*, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected," 21 C.F.R. § 211.142 (emphasis supplied); to follow the responsibilities and procedures applicable to the quality control unit by retesting or reexamining drug components for identity, quality and purity (*e.g. after storage for long periods of time or after exposure to air, heat* or other conditions that might adversely affect the components), as required by 21 C.F.R. § 211.87;

to test in-process materials "for identity, strength, quality, and purity …during the production process, e.g., at commencement or completion of significant phases or after storage for long periods," 21 CFR § 211.110(c); and to establish control procedures to validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug market, as required by 21 CFR § 211.110(a). (emphasis supplied.)

93.    Again, Defendants cannot have followed all of the above practices, which address preventing variability in the product based on, *inter alia*, temperature, and retesting the product after exposure to various conditions.  This is evident because if they had, they would have had to acknowledge the degradation of their Products to form benzene and taken steps to disclose and address it.

94.    Moreover, under cGMPs:

[a]ll drug product production and control records, including those for packaging and labeling, shall be reviewed and approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed. ***Any unexplained discrepancy*** (including a percentage of theoretical yield exceeding the maximum or minimum percentages established in master production and control records) ***or the failure of a batch or any of its components to meet any of its specifications shall be thoroughly investigated, whether or not the batch has already been distributed***. The investigation shall extend to other batches of the same drug product and other drug products that may have been associated with the specific failure or discrepancy.

21 C.F.R. § 211.192  (emphasis supplied.)  On information and belief, Defendants have not done so, which is evidenced by their failure to address the issues set forth in the Valisure report.

95.    Defendants' failure to comply with cGMPs is another factor that renders the Products adulterated, misbranded and/or illegal to sell.

**2.    Defendants Also Failed to Comply with State Laws that Replicate or Adopt FDCA and cGMP Requirements**

96.    Many states have laws that establish an independent obligation for drug manufacturers to ensure that the medications ultimately received by consumers are produced in compliance with cGMPs.  This duty arises from such states' adoption and/or observance of federal requirements concerning cGMP and the prevention of adulteration.  Defendants were also bound to but did not follow these analogous state law requirements.  Such state statutes include, but are not limited to, the following:

- Alabama Code §§ 20-1-24, -26(3), and -27(1);

- Alaska Statutes § 17.20.290(a)(1);

- Arizona Statutes §§ 32-1965(1), (2) and -1966(3);

- Arkansas Code § 20-56-215(1);

- California Health and Safety Code §§ 110105, 111260;

- Colorado Statutes §§ 25-5-403(1)(a),(b) and -414(1)(c);

- Connecticut General Statutes §§ 21a-93, 21a-105-106

- Title 16, Delaware Code §§ 3302 and 3303(2);

- District of Columbia Code § 48-702(2);

- Florida Statutes §§ 499.01(n)(3), 499.005(1) and .006(3);

- Georgia Code §§ 26-3-3(1), 26-3-22;

- Guam Statutes 10 G.C.A. § 40114;

- Hawaii Revised Statutes §§ HRS § 328-1, 328-6(1) and -14(1)(B)(ii);

- Indiana Code § 16-42-1-16

- Idaho Code § 37-115(a);

- Iowa Code §§ 126.3(1) and .9(1)(c);

- Chapter 410, Illinois Statutes §§ 620/3.1, /14(a)(2)(B) and /21;

- Kansas, K.S.A. 65-668 and 65-1626

- Kentucky Statutes § 217.175(1);

- Maryland Code, Health–General §§ 21-216(c)(5)(2) and -256(1);

- Massachusetts General Laws chapter 94 §§ 186 and 190;

- Michigan, MCL § 333.17764

- Minnesota Statutes §§ 151.34(1) and .35(1);

- Missouri Statutes § 196.015(1);

- Montana Code §§ § 50-31-305(3) and -501(1);

- Louisiana Rev. Stat. § 40:636

- Nebraska Revised Statutes §§ 71-2461(2) and -2481;

- Nevada Statutes §§ 585.210, .380, and.520(1);

- New Hampshire Revised Statutes §§ 146:1(I) and :4(V);

- New Jersey Rev Stat § 24:5-1;

- New Mexico Statutes §§ 26-1-3(A) and -10(A);

- New York Education Law § 6811;

- North Dakota Century Code §§ 19-02.1-02(1) and .1-13(3);

- Ohio Code § 3715.52(A)(1);

- Oklahoma Statutes title 63 § 1-1402(a);

- Title 35, Pennsylvania Statutes §§ 780-113(a)(1), 780-133;

- Title 21, Rhode Island General Laws § 21-3-3(1);

- South Carolina Code §§ 39-23-30(a)(2)(B) and -80(A)(1);

- South Dakota Code §§ 39-15-3 and -10;

- Texas Health and Safety Code § 431.111, 021(a), (b)

- Title 18, Vermont Statutes § 4052(1);

- Virginia Code § 54.1-3457(1);

- Washington Revised Code § 69.04.040

- West Virginia Code §§ 16-7-1 and -2(a)(3); and

• Wyoming Statutes §§ 35-7-111(a)(i)–(iv), (vi) and -116.

97.    Defendants violated these statutes with the same acts that violated cGMPs.  The presence of elevated benzene levels in Defendants' BPO Products on the U.S. market reflects a significant breakdown in their quality control and testing procedures, in violation of the cGMP standards incorporated into state law.

## III.    THE HARM THAT DEFENDANTS CAUSED TO CONSUMERS

98.    As a manufacturer, distributor, and seller of OTC drug products, Defendants had and continue to have a duty to ensure their Products did not contain excessive (or any) levels of benzene, including through regular testing.  But based on Valisure's testing results set forth above, Defendants made no reasonable effort to test its Products for benzene or other impurities, or if it did test them, it made no reasonable effort to disclose them to Plaintiff or any other consumers in any product advertising, labeling, packaging, or marketing that its anti-acne products contained dangerous amounts of benzene or to eliminate the risk of benzene formation. To the contrary, Defendants represented and warranted, expressly and impliedly, that the Products safe and effective for their intended use, were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

99.    If Defendants had fulfilled their quality assurance obligations, Defendants would have identified the presence of the benzene contaminant almost immediately and responded appropriately.

100.    Accordingly, Defendants knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

101.    Further, Plaintiff and Class Members bargained for Products free of contaminants

and dangerous substances, and were deprived the basis of their bargain when Defendants manufactured and sold them products containing or at risk of containing the dangerous substance benzene.  Had Defendants not misrepresented that the Products did not contain or were not at risk of containing benzene, and/or had Defendants not failed to disclose that the Products contained or were at risk of containing benzene, Plaintiff and Class Members would not have purchased based on these misrepresentations or omissions.

102.    When Plaintiff purchased Defendants' Products, Plaintiff did not know, and had no reason to know, that Defendants' Products were adulterated and misbranded and unlawful to sell as set forth herein.  Not only would Plaintiff not have purchased Defendants' Products had he known the Products contain or risked containing benzene, he would not have been capable of purchasing them if Defendants had done as the law required and tested the Products for benzene and other carcinogens, reproductive toxins, and impurities, because the Products would have been deemed adulterated and misbranded, and therefore illegal to sell.

103.    Moreover, no reasonable consumer would have paid as Plaintiff and members of the proposed Class did here for products containing benzene, a known carcinogen and reproductive toxin, much less containing benzene in levels above the limits set by the FDA (even assuming those allowances apply to Defendants' products).

104.    Plaintiff and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and misbranded due to the presence of harmful levels of benzene.  Such illegally sold Products are worthless and have no value.  *See Barnes v. Unilever United States Inc.*, No. 21 C 6191, 2022 WL 2915629, at *1-3 (N.D. Ill. July 24, 2022); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, MDL No. 2875, 2021

WL 222776, at *16 (D.N.J. Jan. 22, 2021).

105.    Plaintiff thus brings this action on behalf of himself and the Class and subclasses for equitable relief and to recover damages and restitution for: (i) violation of Sections 349 and 350 of the New York General Business Law; (ii) violations of various additional state consumer protection acts; (iii) breach of implied warranty; (iv) negligent misrepresentation; and (v) unjust enrichment.

106.    Plaintiff and Class members are entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

## CLASS ACTION ALLEGATIONS

107.    Plaintiff seeks to represent a class defined as all persons in the United States who purchased the anti-acne products for personal or household use within any applicable limitations period (the "Class").

108.    Plaintiff also seeks to represent a subclass of all Class Members who purchased the anti-acne products for personal or household use in New York within any applicable limitations period (the "New York Subclass").

109.    Plaintiff further seeks to represent a subclass of all Class Members who purchased the anti-acne products for personal or household use in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington within any applicable limitations period (the "Consumer Fraud Multi-State Subclass").[43]

---

[43] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*);

110.    The New York Subclass and the Consumer Fraud Multi-State Subclass shall be collectively referred to as the "Subclasses."

111.    The Class and Subclasses are collectively referred to as the "Classes."

112.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

113.    Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

114.    **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Classes is known by Defendants.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution and sales records of Defendants and third-party retailers and vendors.

115.    **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, purchased the

---

Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiff, like all members of the Classes, have been damaged by Defendants' misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

116.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

(a)    whether Defendants knew or should have known the Products contained or were at risk of containing elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;

(b)    whether Defendants are liable to Plaintiff and the Classes for unjust enrichment;

(c)    whether Defendants are liable to Plaintiff and the Classes for fraud;

(d)    whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;

(e)    whether Plaintiff and the Classes are entitled to declaratory and injunctive relief;

(f)    whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendants; and

(g)    whether the marketing, advertising, packaging, labeling, and other

promotional materials for the Products are deceptive.

117.    **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes.  Plaintiff has no interests that are antagonistic to those of the Classes.

118.    **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

119.    In the alternative, the Classes may be certified because:

(a)    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of

other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

120.    Thus, the proposed Class and Subclasses meet all of the requirements for certification pursuant to Rule 23.

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**
**Violation of New York's General Business Law § 349**
**(By Plaintiff Individually and on behalf of the New York Subclass)**

121.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

122.    Plaintiff brings this claim individually and on behalf of the proposed New York Subclass against Defendants.

123.    New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

124.    In its sale of goods throughout the State of New York, Defendants conduct business and trade within the meaning and intendment of New York's General Business Law § 349.

125.    Plaintiff and members of the New York Subclass are consumers who purchased products from Defendants for their personal use.

126.    By the acts and conduct alleged herein, Defendants have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, representing that the Products were acne-fighting Products that could be used for those purposes, by representing that

the only active ingredient in the Products was were those listed on the labels and by failing to disclose the presence of benzene in the Products.

127.    The foregoing deceptive acts and practices were directed at consumers.

128.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics of the Products to induce consumers to purchase same.  Defendants' misrepresentations and omissions of fact were material.  GBL 349 does not require pleading reliance and Plaintiff is not pleading an element of reliance in asserting this claim.

129.    By reason of this conduct, Defendants engaged in deceptive conduct in violation of New York's General Business Law.

130.    Defendants' actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and members of the New York Subclass have sustained from having paid for and consumed Defendants' products.

131.    As a result of Defendants' violations, Plaintiff and members of the Subclass have suffered damages because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained benzene and are not generally recognized as safe; (b) they would not have purchased the Products or would not have purchased them on the same terms if they knew that the Products could not be used for their intended purpose; (c) they paid a price premium for the Products due to Defendants' misrepresentations and omission of the fact that the Products contained benzene and the misrepresentations that the Products contained only the active ingredient tolnaftate; and (d) the Products do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

132.    On behalf of himself and other members of the New York Subclass, Plaintiff

seeks to recover her actual damages or fifty dollars, whichever is greater, three times actual

damages, and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**Violation of New York's General Business Law § 350**
**(By Plaintiff Individually and on behalf of the New York Subclass)**

133.    Plaintiff incorporates by reference the allegations contained in paragraphs 1

through 120 above as if fully set forth herein.

134.    Plaintiff brings this claim individually and on behalf of the proposed New York

Subclass against Defendants.

135.    New York's General Business Law § 350 prohibits false advertising in the

conduct of any business, trade, or commerce.

136.    Pursuant to said statute, false advertising is defined as "advertising, including

labeling, of a commodity … if such advertising is misleading in a material respect."  GBL § 350-

a.

137.    Based on the foregoing, Defendants have engaged in consumer-oriented conduct

that is deceptive or misleading in a material way which constitutes false advertising in violation

of Section 350 of New York's General Business Law.  GBL 350 does not require pleading

reliance and Plaintiff is not pleading an element of reliance in asserting this claim.

138.    Defendants engaged in a material misrepresentation by representing that the

Products' ingredients were as listed while materially omitted the true facts regarding the

Products, namely that they contained benzene and were unsafe and unfit for their intended use.

139.    Defendants' false, misleading, and deceptive statements and representations of

fact and omissions were and are directed to consumers.

140.    Defendants' false, misleading, and deceptive statements and representations of fact and omissions were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

141.    Defendants' false, misleading, and deceptive statements and representations of fact and omissions have resulted in consumer injury or harm to the public interest.

142.    As a result of Defendants' false, misleading, and deceptive statements and representations of fact and omissions, Plaintiff and the Subclass have suffered economic injury because the Products were worthless and Plaintiff and the New York Subclass paid a price premium for the Products in the amount of the full purchase price of the Products.

143.    As a result of Defendants' violations, Plaintiff and members of the New York Subclass have suffered damages because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained benzene, and are not generally recognized as safe; (b) they would not have purchased the Products or would not have purchased them on the same terms if they knew that the Products could not be used as acne-fighting medications; (c) they paid a price premium for the Products due to Defendant's omission of the fact that the Products contained benzene and the misrepresentation that the Products contained only tolnaftate as an active ingredient; and (d) the Products do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

144.    On behalf of himself and other members of the New York Subclass, Plaintiff seeks to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Fraud Acts**
**(By Plaintiff Individually and on behalf of the Consumer Fraud Multi-State Subclass)**

145.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

146.    Plaintiff brings this claim individually and on behalf of the members of the Consumer Fraud Multi-State Subclass against Defendants.

147.    The Consumer Fraud and Consumer Protection Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

148.    Plaintiff and Consumer Fraud Multi-State Subclass Members have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and Consumer Fraud Multi-State Subclass Members have suffered an injury in fact and lost money as a result of Defendants' actions set forth herein.

149.    Defendants engaged in unfair conduct, including but not limited to selling adulterated and misbranded products in violation of the FDCA.

150.    Defendants engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain or did not risk containing benzene, and failing to disclose that the Products contained or risked containing benzene.

151.    Defendants intended that Plaintiff and Consumer Fraud Multi-State Subclass Members would rely upon their unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

152.    Given Defendants' position in the health and beauty market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Defendants' representations and omissions regarding the presence of benzene in the Products.

153.    As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and Consumer Fraud Multi-State Subclass Members have sustained damages in an amount to be proven at trial.

154.    In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**FOURTH CLAIM FOR RELIEF**
**Breach of Implied Warranty**
**(By Plaintiff Individually and on behalf of the**
**Nationwide Class and the New York Subclass)**

155.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

156.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the New York Subclass against Defendants.

157.    These claims are governed by substantially identical Uniform Commercial Code provisions adopted by every state.

158.    Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Products (i) would not contain elevated levels of benzene above acceptable daily intake limits, (ii) are generally recognized as safe for human consumption, and (iii) were not adulterated or misbranded such that the Products were lawful to sell in the United States and in the State of New York.  By selling the defective Products to Plaintiff and Class members and members of the New York Subclass, Defendants breached each of these implied warranties.

159.    Defendants breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the

Products were unfit for their intended and ordinary purpose because the Products manufactured by Defendants were defective in that they contained elevated levels of carcinogenic benzene above the legal limit, and as such are not generally recognized as safe for human consumption. As a result, Plaintiff and Class and New York Subclass members did not receive the goods as impliedly warranted by Defendants to be merchantable.

160.    Plaintiff, Class, and New York Subclass members purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

161.    The Products purchased by Plaintiff and members of the Class and the New York Subclass were not altered by Plaintiff or Class or New York Subclass members.

162.    The Products were defective when they left the exclusive control of Defendants.

163.    Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and the Class and the New York Subclass members.

164.    The Products that Plaintiff, the Class, and the New York Subclass purchased were defectively manufactured and unfit for their intended purpose because they contained elevated levels of benzene above the legal limit, and Plaintiff and Class and New York Subclass members did not receive the goods as warranted.  The Products were also adulterated and misbranded, and as such was unfit for use as a prescription medication because adulterated and misbranded medications are illegal to sell.

165.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class and New York Subclass members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene, and are not generally recognized as safe for human

consumption; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

166.    On August 5, 2025, prior to filing this action, Plaintiff served Defendant with a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  A true and correct copy of the letter is attached hereto as **Exhibit A**.

**FIFTH CLAIM FOR RELIEF**
**Negligent Misrepresentation**
**(By Plaintiff Individually and on behalf of the Nationwide Class and Subclasses)**

167.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

168.    Defendants had a duty to disclose to Plaintiffs and Class members the Products' actual quality and characteristics.

169.    Defendants negligently and/or carelessly misrepresented, omitted and concealed from consumers material facts relating to the quality and characteristics of the Products, including through its misrepresenting that the Products were safe, did not contain benzene, and could lawfully be sold as acne treatments.

170.    These misrepresentations and omissions were material and concerned the specific characteristics and quality of its Products that a reasonable consumer would consider in purchasing any dietary supplement.

171.    Defendants made such false and misleading statements and omissions on its Products' labeling with the intention of inducing Plaintiffs and the Class members to purchase the Products.

172.    As a result of Defendants' misstatements, they were under a duty to disclose facts

necessary to correct those misstatements.  Further, Defendants were in a better position to discover the misrepresentations than Plaintiffs because Defendants controlled the Products' design, manufacturing, testing, and marketing processes.

173.    At the time they made the representations, Defendants knew, or by the exercise of reasonable care should have known, that the statements were false.

174.    Defendants advertised and marketed their Products with the intent to induce Plaintiffs and Class members to purchase the Products.

175.    Defendants knew, or should have known, that without the misrepresentations and/or omissions, Plaintiffs and the classes would not have purchased the Products or would have paid less for the Products than they did.

176.    Plaintiffs and the Class justifiably relied upon Defendants' misrepresentations and/or omissions about the Products' quality and characteristics.

177.    Plaintiffs and the Class were unaware of the falsity of Defendants' misrepresentations and omissions and, as a result, justifiably relied on them in deciding to purchase the Defendants' Products.  Had Plaintiffs and Class members been aware of the true nature and quality of the Products, they would not have purchased them or would have paid less for the Products than they did.

178.    As a direct and proximate result of Defendants' misrepresentations and/or omissions of material fact, Plaintiffs and Class members have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment (in the Alternative)**
**(By Plaintiff Individually and on behalf of the Class and Subclasses)**

179.    Plaintiff incorporates by reference the allegations contained in paragraphs 1

through 120 above as if fully set forth herein.

180.    Plaintiff brings this claim individually and on behalf of the members of the Class and subclasses (collectively the "Class" for the purpose of this Claim) against Defendants.

181.    This claim is pled in the alternative to Plaintiff's claims for the breach of implied contractual duty.

182.    Plaintiff and the Class conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective and worthless Products.

183.    Defendants voluntarily accepted and retained this benefit.

184.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendants to retain the benefit without paying the value thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representatives for the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated:  8/26/2025                    Respectfully Submitted,

By: */s/ Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Benjamin Y. Kaufman*
Kate McGuire*
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Ave.
New York, NY 10016
Tel : (212) 545-4600
Fax: (212) 686-0114
kaufman@whafh.com
mcguire@whafh.com

Don Bivens*
Albert Plawinski*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Tel: (602) 708-1450
don@donbivens.com
albert@donbivens.com
*pro hac vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*